IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NOAH CARTER | : | CIVIL ACTION |
| | : | NO. 08-279 |
| v. | : | |
| | : | |
| DR. RALPH SMITH, et al. | : | |

O'NEILL, J.                                                                    JUNE 13, 2011

MEMORANDUM

In this action, plaintiff Noah Carter alleges that defendants violated his Eighth Amendment right to be free from cruel and unusual punishment.[1] Defendants Knauer, Stanishefski and DiGuglielmo ("commonwealth defendants") have filed a motion for summary judgment. Defendants Prison Health Services, Smith and Stefanic ("medical defendants") have filed a separate motion for summary judgment. Plaintiff has filed one response brief in opposition to both motions and defendants have filed reply briefs. For the following reasons I will grant the motions.

BACKGROUND

Plaintiff has been incarcerated at SCI-Graterford since 1977. Carter Dep. 7:18-1977 (Apr. 23, 2010) (Def.'s Ex. R.) (Doc. No. 57). In 1999, he began to feel severe pain in his back. Id. at 92:18-24. His efforts to obtain effective treatment of his condition form the basis of this lawsuit.

---

[1] Plaintiff has named as defendants: (1) Prison Health Services, Inc.; (2) Ralph Smith; (3) Richard Stefanic; (4) Julie Knauer; (5) Myron Stanishefski; and (6) David DiGuglielmo. In his amended complaint plaintiff also named Donald T. Vaughn and ten John Does as defendants. The parties have stipulated to Vaughn's dismissal with prejudice from the case. Plaintiff has not identified any of the John Doe defendants, nor has he pursued any claims against them.

I.      Plaintiff's Efforts to Obtain an MRI and CT Scan of his Spine and Brain

On September 18, 2001, plaintiff was examined by Anthony Iaccarino, a PHS physician. Id. at 2-4.  Iaccarino referred plaintiff to a neurology consultation with an outside physician and ordered CT scans of plaintiff's head and lumbosacral spine.  See id.  The three orders were sent to Ralph Smith, PHS's medical director at Graterford, for approval.  See id.  Smith disapproved the neurological referral, questioning whether "[a]ny diagnostic studies (x-rays, CT scan, EMG) [were] performed prior to neurology intervention?" and whether "he [had] been worked up in past for this disorder?"  See id. at 2.  Smith likewise disapproved Iaccarino's request for a CT of plaintiff's head, requesting that Iaccarino "[p]lease indicate whether there is cervical symptomatology (is right-sided weakness, involvement of the upper right extremity).  If so, has cervical film been reviewed?"  See id. at 3.  Smith also disapproved Iaccarino's request for a CT of plaintiff's lumbosacral spine.  Id. at 4.  In explaining this decision, he wrote "[h]as plaintiff been treated aggressively for chronic lumbosacral strain in the past?  Any response to muscle relaxants, physical therapy, short-term lumbosacral supportive device?  Any findings consistent with lumbosacral radiculopathy?"  Id.

Smith testified that he disapproved the order because he knew that the neurologist would want to see such "baseline studies" before proceeding with the CT scan.  See Smith Dep. 58:19-24 (Apr. 29, 2010) (Def.'s Ex. T).  Additionally, Smith thought that the basic tests might reveal the cause of plaintiff's symptoms without having to refer plaintiff to an outside physician for the neurological tests.  Id. at 59:13-20.  Handling the diagnosis in this manner was "good medical practice" according to Smith, see id. at 60:6-10, and eliminated the security risks associated with transporting prisoners outside the prison.  Id. at 61:2-17.  With respect to the CT scans that

Iaccarino had ordered, Smith concluded that Iaccarino was "[proceeding] out of order." Id. at 73:6-7. Iaccarino should have attempted to diagnose the cause of plaintiff's symptoms by undertaking an x-ray and an "adequate physical examination" before seeking outside consultation. Id. at 71:3-11, 73:8. Smith also believed that by pursuing such in-house diagnostic techniques first Stan Stannish, PHS's regional medical director, would be more likely to approve outside tests if they proved to be necessary. Id. at 74:9-12. Smith denied that he disapproved the CT tests for economic reasons. Id. at 74:13-75:1.

On December 5, 2001, J.C. Korszniak, a physician's assistant employed by PHS, examined plaintiff and ordered an MRI of his brain. See Def.'s Ex. V at 10 (Consultation Record). Smith disapproved the order the next day on the grounds that he did not have the physician's report from plaintiff's recent visit to the hospital for a "stroke work-up." See Smith Dep. 79:1-10. He thought that plaintiff may have undergone an MRI as part of the stroke work-up and, if so, did not want to order duplicative tests. See id. at 79:7-9. Smith again testified that he did not disapprove Korszniak's order for economic reasons. See id. at 80:4-6. In fact, he stated categorically that "[he] wouldn't base [his] decision [to disapprove a test] on economics." Id. at 80:22-24.

A.    Plaintiff's June 2002 Request to Staff Member

In response to Smith's disapproval of these four referrals, plaintiff filed a form entitled "inmate's request to staff member." See Inmate's Request to Staff Member from plaintiff to DiGuglielmo (June 26, 2002) (Def.'s Ex. C). In the request form, plaintiff stated that prison doctors had referred him for "cat scans" and an MRI. He sought clarification as to why the tests had not yet been scheduled. Id. Julie Knauer, a correctional health care administrator and

medical grievance officer employed by PHS, responded several weeks later that "[plaintiff's] CT consults written on 9/18/01 for CT of head and CT of spine were disapproved by Dr. Smith on 9/19/01. [Plaintiff's] MRI consult written on 12/5/01 was disapproved by Dr. Smith on 12/6/01." Id.

      B.     Grievance Number 29209 - Plaintiff's August 2002 Effort to Obtain CT Scans of his Back

Unsatisfied with Knauer's response, plaintiff filed grievance number 29209 on August 27, 2002, complaining that the disapproval of the referral orders constituted a denial of medical treatment. See Grievance No. 29209 from plaintiff to L. Hatcher (Aug. 27, 2002) (Def.'s Ex. C). Knauer responded to grievance number 29209 on September 12, 2002. See Official Inmate Grievance Initial Review Response from Knauer to Plaintiff (Sep. 12, 2002) (Def.'s Ex. C). She stated that plaintiff had received an ultrasound on January 15, 2002, the results of which were normal. Id. She also stated, without explanation, that the referrals for the CT scans and MRI were disapproved by Smith. Id. She indicated, however, that Smith had scheduled plaintiff for a consultation with a neurologist in September 2002 and promised that Smith would carefully review the neurologist's recommendation. Id. Knauer testified at her deposition that she did not have the authority to uphold plaintiff's grievance and order the medical department to conduct the tests that had been ordered. Knauer Dep. 94:15-24 (Apr. 9, 2010) (Def.'s Ex. D).

On September 30, 2002, plaintiff visited Dr. Ayeesha Kamal, a neurologist at Temple University. She diagnosed plaintiff as either having suffered a stroke or having a lesion on his central nervous system. She ordered an MRI of plaintiff's head and spine to obtain additional information. She requested that plaintiff return within two weeks of the completion of the MRI

for further treatment.

In a response to Knauer's denial of his grievance, plaintiff suggested that Knauer's reference to plaintiff's ultrasound was her attempt to "evad[e] the real issue." See Answer of Grievance No. 29209 (Oct. 7, 2002) (Def.'s Ex. C.). Anticipating that Kamal would be prevented by prison administrators from reordering an MRI and/or a CT scan, he argued that such prevention would constitute cruel and unusual punishment. Id.

On October 7, 2002, Vaughn, the Superintendent of Graterford, sent a memorandum to plaintiff indicating that he would "uphold the Grievance Officer's action in this case. The Medical Department is in the best position to address your concerns and take the appropriate action." See Memo. from Vaughn to plaintiff (Def.'s Ex. C). Despite his dissatisfaction with Vaughn's decision, plaintiff did not file an appeal because "[he] was told that the medical department [would] address [his] concerns." See Pl.'s Dep. 103:13-15.

On November 4, 2002, plaintiff underwent the MRI ordered by Kamal, which revealed an "intermedullary cord lesion" extending from the C3 region of his cervical spine to the C6 region.

II.     Grievance Number 45405 - Plaintiff's February 2003 Efforts to Schedule a Follow-up
        Visit with a Temple University Hospital Neurologist

Plaintiff filed grievance number 45405 on February 28, 2003. See Grievance No. 45405 from plaintiff to L. Hatcher (Feb. 28, 2003) (Def.'s Ex. C). In that grievance, he asserted that the November 4, 2002 MRI revealed that his "medical condition had worsened and a knot had appeared on [his] spinal column." Id. As a result of his condition, plaintiff alleged that on November "12-14" he was approved "to revisit the neurologist [Kamal] at Temple Hospital for treatment." Id. Plaintiff believed that his visit to Kamal would occur within "30-60 days after

approval." Id. He followed up on December 10, 2002 with his unit manager "Mr. Kovalchik" who "got in touch with J. Knauer and was told [plaintiff] was approved to go to Temple for treatment." Id. On January 28, 2003, however, Iaccarino notified plaintiff that no order had been issued for plaintiff to revisit the neurologist. Id. Via the February 28, 2003 grievance, plaintiff again requested that he be permitted to visit the neurologist. Id.

Knauer responded to grievance number 45405 on March 17, 2003. See Official Inmate Grievance Initial Review Response from Knauer to Plaintiff (Mar. 17, 2003) (Def.'s Ex. C). She noted that plaintiff returned to Temple on March 3, 2003. Id. The neurologist, however, requested the "actual MRI films," which apparently were unavailable at the time of plaintiff's visit. Id. Knauer informed plaintiff that "the clinic coordinator received the MRI films today [March 17, 2003] and will call to set up your return visit to Temple." Id. Plaintiff testified at his deposition that he ultimately did return to Temple on March 19, 2003. Pl.'s Dep. 105:8-10. Nevertheless, plaintiff believes that he appealed Knauer's decision to the Superintendent. Id. at 105:11-16. No documentation of such an appeal appears in the record.

While plaintiff was at Temple he received, pursuant to Kamal's instructions, intravenous steroids, a spinal tap and a lumber puncture. Kamal examined plaintiff again on April 28, 2003 to determine whether the March 19, 2003 treatment had had any effect on plaintiff's condition. She determined that the steroid treatment had not been effective but that the lesion was stable. She recommended a repeat MRI within three to four months.

On July 28, 2003, plaintiff underwent an MRI which indicated that the mass was stable. On October 21, 2003, plaintiff visited with Dr. Allen Weber, a neurologist, who noted that plaintiff's lesion was stable. He recommended that plaintiff schedule a follow-up visit in three

months.

III.     Grievance Number 75662 - Plaintiff's February 2004 Efforts to Visit Internal Medicine
         Personnel and a Neurologist

On February 10, 2004, Carter filed grievance number 75662 wherein he complained that

his scheduled visits with "internal medicine personnel" and with Dr. Weber had both been

cancelled.  See Grievance No. 75662 from plaintiff to L. Hatcher (Feb. 10, 2004) (Def.'s Ex. C).

Knauer responded on March 3, 2004.  See Official Inmate Grievance Initial Review Response

from Knauer to Plaintiff (Mar. 3, 2004) (Def.'s Ex. C).  She noted that plaintiff had been "seen in

chronic clinic on February 25, 2004."  Id.  She conceded that the neurologist had requested a

follow up visit in approximately three months but informed plaintiff that before scheduling the

visit PHS would first determine whether such a consultation was "medically indicated."  Id.  At

her deposition, Knauer explained that whenever an outside physician recommended a certain

course of treatment the prison medical director or one of PHS's physicians would review the

recommendation.  Knauer Dep. 117:8-20.  If the reviewing physician agreed with the outside

physician's recommendation he or she would write a consult, allowing the prisoner to receive the

recommended treatment.  Id.

Plaintiff appealed Knauer's decision to DiGuglielmo who was, by then, serving as

Superintendent of Graterford.  See Appeal of Grievance from plaintiff to DiGuglielmo (Def.'s Ex

C).  He argued first that Knauer's assertion that plaintiff was examined on February 25, 2004 by

medical staff in the chronic clinic was false.  Id.  According to plaintiff, he had been examined by

a licensed practical nurse in the cholesterol clinic, not by an internal medicine physician in the

chronic clinic.  Id.  He also noted that in October of 2003 the neurologist had recommended that

plaintiff return within three months for further treatment.  Id.  Plaintiff asserted that the

neurologist intended to begin treatment of plaintiff's spinal problem during the follow up visit.

Id.  He also noted that this was not the first time that a neurologist had indicated that plaintiff

needed treatment for the lesion on his spine.  Id.

On March 25, 2004, in response to plaintiff's appeal of Knauer's decision, DiGuglielmo

modified Knauer's decision.  See Memorandum from DiGuglielmo to plaintiff (Mar. 25, 2004)

(Def.'s Ex. C).  He stated "you have a lengthy history of problems with your back.  A consult

was written.  Dr. Arias will see you on 3/28/04 and I am hopeful that he will address your

concerns."  Id.

When asked at his deposition whether he was satisfied with DiGuglielmo's decision,

plaintiff answered

> I had to be.  I had to wait and see what they [were] going to do.  The
> response says he's modifying the decision, that I would be seen by the
> doctor to address my concerns.  I had to wait to see when they were
> going to schedule me to see the doctor and see what they were going
> to do.  Once they did not do it, then I had to file a grievance again.

Pl.'s Dep. 109:5-12.

Despite the fact that DiGuglielmo indicated to plaintiff that he would be seen by Dr.

Arias, it appears that plaintiff was instead examined by Dr. Weber as part of a "follow-up

neurological consultation for chronic right hemiparesis and sensory disturbances."  See Letter

from Allan Weber, M.D. to Felipe A. Arias, M.D. (July 21, 2004) (Def.'s Ex. C); Pl.'s Dep.

109:13-17.  Plaintiff underwent an MRI during the examination.  After the examination, Weber

sent a letter to Arias detailing his findings and recommendation.  See Letter from Weber to Arias.

Weber noted that the lesion remained stable but recommended that plaintiff receive Zanaflex for

"paralumbar muscular tension" and a "physical therapy evaluation" involving stretching exercises and a strengthening program.  Id.  Finally, Weber recommended that plaintiff undergo a "repeat MRI of just the cervical spine in approximately one year to ensure stability of [the] lesion."  Id.  Plaintiff testified that prison officials did not give him Zanaflex but instead prescribed "some substitute [medication]."  Pl.'s Dep. 111:6-11.

IV.     Grievance Number 93634 - Plaintiff's August 2004 Efforts to Obtain a Renewal of his
        Prescriptions and an Appointment with an Internist

        On August 23, 2004, plaintiff filed grievance number 93634, complaining that he had been "overlooked" for an internal medicine appointment to renew his prescriptions.  See Grievance No. 93634 from plaintiff to Wendy Moyer (Aug. 23, 2004) (Def.'s Ex. C).  According to the grievance, plaintiff also wished to visit the internist "to speak with him about [plaintiff's] medical condition."  Id.  Plaintiff had written to Knauer on August 8, 2004 in an attempt to have his appointment scheduled.  Id.  He asserted that he had not received a response from Knauer and that as of the date of his grievance, his prescriptions had run out and his condition had deteriorated.  Id.

        Plaintiff's grievance was reviewed by defendant Myron Stanishefski, the correctional health care administrator.  See Official Inmate Grievance Initial Review Response from Stanishefski to Plaintiff (Aug. 26, 2004) (Def.'s Ex. C).  Stanishefski wrote:

>       Dear Mr. Carter:
>
>       You are correct.  You should have been seen in July for chronic clinic.  You were seen on August 24, 2004.  We will ensure that this does not occur again in the future.

Id.  Plaintiff testified that he was only partly satisfied with this response because although

Stanishefski asserted that this problem would not occur again according to plaintiff it happened "over and over and over and over." Pl.'s Dep. 112:21 - 113:2. Plaintiff does not remember if he appealed to DiGuglielmo on this basis, see Pl.'s Dep. 113:6-8, but no evidence of such an appeal appears in the record.

A.    Plaintiff's March 2005 Letter to Stanishefski Seeking a Consultation with an Internist

On March 22, 2005, plaintiff wrote to Stanishefski to raise his concern that he had not yet seen an internist. See Inmate's Request to Staff Member from plaintiff to Stanishefski (Mar. 22, 2005) (Def.'s Ex. C). Plaintiff asserted in that letter that he had been seen by a physician about his cholesterol but that he had not been permitted to consult with an internist regarding the lesion on his spine. Id. Jean Wooster, a registered nurse employed by PHS, responded that plaintiff had been seen in the chronic care clinic on February 8, 2005. Id. Plaintiff could not remember whether he had been seen in the chronic care clinic as Wooster asserted. Pl.'s Dep. 114:8-10. In any event, he testified that he was not satisfied with Wooster's response but did not offer any particular reasons for his dissatisfaction. Id.

V.    Grievance Number 146347 - Plaintiff's March 2006 Assertion that he Had Been Receiving Inadequate Medical Treatment

Plaintiff filed grievance number 146347 on March 9, 2006 asserting several inadequacies with the medical treatment that he had been receiving. See Grievance No. 146347 from plaintiff to Wendy Moyer (Mar. 9, 2006) (Def.'s Ex. C). He asserted that he filed the grievance because he was "in severe pain and nothing [was] being done about it, despite [having brought it] to the attention of the medical department." Id. He stated that Dr. Standish[2] had suggested that

---

[2]    It is unclear whether "Dr. Standish" is a reference to Dr. Stannish.

plaintiff visit an internist in February 2006 but that "the [suggested] appointment never took place . . . ." Id. He also noted that "in the interim the medication [he] was taking ran out and was never renewed" and that the "the groin and hip brace that was prescribed for [him] by the internal medicine doctor and others was never given to [him]." Id. According to plaintiff, the hip and groin braces had been prescribed more than three years prior to the date of the grievance. Id. Plaintiff also complained that he had been scheduled for an appointment in June 2005 to consult with a neurologist[3] but that appointment had not occurred. Id. When plaintiff raised these concerns with "Major Feild"[4] he received only an appointment with the cholesterol clinic. Id.

Stanishefski upheld grievance number 146347 on March 24, 2006. See Official Inmate Grievance Initial Review Response from Stanishefski to Plaintiff (Mar. 24, 2006) (Def.'s Ex. C). Stanishefski stated that plaintiff had been seen in the chronic clinic on January 9, 2006 and had a follow-up visit scheduled for April 3, 2006 during which his asthma and cholesterol would be treated. Id. The response also noted that plaintiff had been seen by a prosthetics company on January 25, 2006 and that he should have received the requested braces by the time the grievance was filed. Id. It appeared that the prosthetics company had been delayed because they were "waiting on a quote"–presumably for the manufacturing of the braces. Id. Stanishefski promised that plaintiff would have an MRI scheduled to determine the state of the lesion on his spine. Id.

Plaintiff appealed to DiGuglielmo because he believed that the concerns he expressed in

_____

[3]        Plaintiff testified that he had been scheduled to visit the "neuropathy clinic." There is no dispute that plaintiff was referring to a neurology consultation.

[4]        Major Feild is not identified in the record.

11

grievance number 146347 had not been addressed in Stanishefski's response.  <u>See</u> Appeal of Grievance No. 146347 from plaintiff to DiGuglielmo (undated) (Def.'s Ex. C).  He noted that he had not received the consultations with a neurologist or with an internist that had been recommended.  <u>Id.</u>  He asserted that instead of sending him to the appropriate physicians "the medical department sent [him] to a cholesterol clinic just to say that [he had] seen a doctor."  <u>Id.</u>  He also complained again that more than three years after he had been prescribed hip and groin braces he still had not received the braces.  <u>Id.</u>  He reminded DiGuglielmo that DiGuglielmo himself had checked on the status of the braces more than two years prior to the date of the appeal.  <u>Id.</u>  Plaintiff also took issue with Stanishefski's assertion that the prosthetics company was delayed because it was waiting on a quote.  According to plaintiff, the brace that had been delayed because of an issue with the quote was a foot brace.  <u>Id.</u>  Finally, plaintiff asserted that he was supposed to have been seen on April 3, 2006 by the chronic clinic for his asthma and cholesterol but that visit had not yet been scheduled.  <u>Id.</u>

On April 18, 2006, in response to plaintiff's appeal DiGuglielmo modified Stanishefski's decision.  <u>See</u> Memorandum from DiGuglielmo to plaintiff (Apr. 18, 2006) (Def.'s Ex. C).  DiGugliemo stated that plaintiff had received an MRI on April 17, 2006.  <u>Id.</u>  He also promised to "follow up with PHS staff to see where [the] consult for the brace is."  <u>Id.</u>  He acknowledged, however, that "[f]rom [his] experience, it is possible that they may not be able to improve [plaintiff's] condition significantly."  <u>Id.</u>

Plaintiff testified that shortly after receiving DiGuglielmo's response he was told that he would receive the braces.  Pl.'s Dep. 118:7-8.  He asserts that he did not actually receive braces until "three or four months [before his April 23, 2010 deposition]."  <u>Id.</u> at 118:8-10.  Plaintiff

never received an explanation for the delay.  Id. at 118:14-17.

Plaintiff responded to DiGuglielmo's modification of Stanishefski's decision on April 23, 2006.  See Letter from plaintiff to DiGuglielmo (Apr. 23, 2006) (Def.'s Ex. C).  After thanking DiGuglielmo for reviewing his appeal, plaintiff reminded the superintendent that in "2000-2001" he had been seen by Dr. Kamal who, he asserted, had recommended a three part treatment for plaintiff's ailments.  Id.  First, plaintiff would receive steroids for one week.  Id.  Plaintiff received the steroids but they were not effective.  Id.  The second part of the treatment involved one week of radiation treatment.  Id.  Finally, the third phase involved surgery.  Id.  Plaintiff did not receive either the second or third phases of treatment because, according to him, PHS refused to pay for them.  Id.  Plaintiff did not receive a response to the letter from DiGuglielmo.  Pl.'s Dep. 119:22 - 120:4.

Plaintiff consulted with Weber on June 13, 2006.  After noting that plaintiff's lesion appeared to be expanding, Weber recommended a neurosurgical consultation.  On September 15, 2006, plaintiff was examined by Dr. Carroll Osgood, a neurosurgeon.  Osgood recommended that plaintiff undergo surgery in late 2006.

VI.     Plaintiff's October 2006 Attempt to Receive "Z Code" Status

On October 11, 2006, plaintiff wrote another letter to DiGuglielmo, this time to update the superintendent concerning his medical condition.  See Letter from plaintiff to DiGuglielmo (Oct. 10, 2006) (Def.'s Ex. C).  He wrote that on September 5, 2006 he was sent to SCI-Smithville to be examined by Osgood.  Id.  Plaintiff asserted that Osgood found that the tumor on plaintiff's spine was cancerous and that it had grown from the C-4 section of his spine to the C-7 section.  Id.  Plaintiff informed DiDuglielmo that his prognosis "did not paint a rosy

13

picture"–without surgery he could "be paralyzed or dead inside of 2 or 3 years." Id.  Plaintiff

concluded his letter with a request that he receive "Z Code" status, which would allow him to

live alone in a cell.  Id.; Pl.'s Dep. 123:14 - 124:15.  DiGuglielmo did not respond to plaintiff's

letter.

VII.    Grievance Number 169277 - Plaintiff's Efforts to Schedule Spinal Surgery

On November 10, 2006, plaintiff filed grievance number 169277 complaining that the

spinal surgery that had allegedly been scheduled for the end of October 2006 had not occurred.

See Grievance No. 169277 from plaintiff to Wendy Moyer (Nov. 11, 2006) (Def.'s Ex. C).  Julie

Knauer responded on November 28, 2006.  See Official Inmate Grievance Initial Review

Response from Knauer to Plaintiff (Mar. 24, 2006) (Def.'s Ex. C).  She wrote:

> Mr. Carter:
>
> A chart review indicates you are correct.  Dr. Osgood requested
> surgery for posterior removal C4-7 intramedullary lesion on
> September 15, 2006.  Dr. Long reviewed it and signed off on the
> recommendation on September 18, 2006.  He ordered to scheduled
> [sic] outpatient surgery with Dr. Osgood on September 22, 2006.  Per
> the PHS scheduling program and PHS Clinic Coordinator Jackie
> Wood, the surgery has not been approved or given an authorization
> number from PHS Corporate so that it can be scheduled.  I have
> emailed PHS and the Bureau of Health Care Services to review and
> get this resolved and scheduled.
>
> Your grievance is upheld.

Id.  Plaintiff testified that he was not satisfied with Knauer's response because he wanted to

know why the surgery had not been scheduled.  Pl.'s Dep. 125:12-15.  Plaintiff does not

remember if he appealed this decision.  Pl.'s Dep. 126:2-4.  The record contains no evidence of

such an appeal.

VIII.   Grievance Number 174269 - Plaintiff's December 2006 Attempt to Schedule a Pre-
        Surgery Appointment with the Surgeon and to Ensure that PHS Provided the Necessary
        MRI Films to the Surgeon

On December 21, 2006, plaintiff filed grievance number 174269 complaining that he had

been sent to SCI-Fayette in order to attend a pre-surgery appointment with Dr. William C. Welch

at the University of Pittsburgh Medical Center but PHS had not sent the necessary MRI films for

the surgeon's review.  See Grievance No. 174269 from plaintiff to Moyer (Dec. 21, 2006) (Def.'s

Ex. C).  Stanishefski responded on January 17, 2007.  See Official Inmate Grievance Initial

Review Response from Stanishefski to Plaintiff (Jan. 17, 2007) (Def.'s Ex. C).  He noted that the

films had been sent to SCI-Smithfield where plaintiff was originally scheduled to be examined by

Osgood.  Id.  According to Stanishefski, SCI-Smithfield was responsible for forwarding the films

to SCI-Fayette.  Id.  More importantly, however, Stanishefski stated that SCI-Fayette staff

ultimately received the films and plaintiff was seen by Welch at UPMC.  Id.  Plaintiff returned to

SCI-Graterford on May 2, 2007.

On February 6, 2007, plaintiff underwent a "multilevel posterior cervical laminectomy"

performed by Dr. Welch at UPMC.  Welch did not, however, "perform an intramedullary

resection of the lesion" because he was unable to identify where the lesion ended and the spinal

cord began.  Plaintiff was discharged three days later to SCI-Fayette, where he was scheduled to

remain during his recuperation period.  Welch provided him with physical therapy instructions.

Plaintiff did not, however, receive any physical therapy during his tenure at SCI-Fayette and he

did not receive physical therapy at SCI-Graterford until October 2008.

Welch examined plaintiff again on April 25, 2007.  Following the appointment, Welch

wrote to Michael Hice, a Department of Corrections staff member at SCI-Fayette.  See Letter

from Welch to Hice (Apr. 25, 2007) (Def.'s Ex. C). Welch informed Hice that he did not believe that plaintiff's condition required immediate surgery but warned that surgery might later be necessary if his condition deteriorated. Id. To stay apprised of the condition of plaintiff's lesion, Welch prescribed "yearly MRI imaging performed with and without contrast." Id.

On March 12, 2008 plaintiff underwent an MRI, which showed "no definite evidence of the lesion, but did show spinal stenosis." Pl.'s Br. at 12.

VIII.    Grievance Number 228621 - Plaintiff's May 2008 Effort to Obtain a Complete and Accurate Collection of his Medical Records

On May 12, 2008 plaintiff filed grievance number 228621 in an attempt to correct what he viewed as "misleading information" that had been placed in his medical file and had prevented him from "getting the proper medical treatment and care." See Grievance No. 228621 from plaintiff to Moyer (May 12, 2008) (Def.'s Ex. C). He asserted that on April 9, 2008 he had "signed up for sick call" because he had been suffering from "pain and weakness in his left hip and lower back." Id. The physician who examined him ordered an x-ray of his left hip. Id. When plaintiff asked about the tumor that was embedded on his spine, the physician told him that he would have to see a different doctor about that. Id. Two days later, he had x-rays taken of his left hip. Id. The physician who examined the x-ray films told plaintiff that his "left hip was not too bad and that [his] right hip and spine was alright." Plaintiff's grievance requested clarification as to how PHS could have concluded that his right hip and spine were healthy without having x-rays taken of those areas. Id.

Stanishefski denied plaintiff's grievance. See Official Inmate Grievance Initial Review Response from Stanishefski to Plaintiff (May 12, 2008) (Def.'s Ex. C). In doing so, he informed

plaintiff that the physician's information about his spine came from "a note from Dr. Stefanic on January 28, 2008." Id. He also explained that Stefanic's note indicated that plaintiff was scheduled to have an MRI in one year and that "the mass was stable." Id.

Plaintiff appealed to DiGuglielmo on June 2, 2008. See Appeal to Grievance No. 228621 from plaintiff to DiGuglielmo (June 2, 2008) (Def.'s Ex. C). He complained that he had been scheduled to travel to SCI-Smithfield to have tests done on his spine but that the trip was cancelled. Id. He also asked why PHS had done nothing to remove the tumor which he asserted was causing him constant pain. Id. DiGuglielmo initially dismissed the appeal because plaintiff had not signed it according to Department of Corrections policy. See Memorandum from DiGuglielmo to plaintiff (June 3, 2008) (Def.'s Ex. C). Upon plaintiff's resubmission of a signed copy of the appeal, DiGuglielmo upheld Stanishefski's response. See Memorandum from DiGuglielmo to plaintiff (June 19, 2008) (Def.'s Ex. C). He noted that plaintiff was "disputing information provided by a trained medical professional. I [DiGuglielmo] am not qualified to ovverrule their decisions." Id.

IX.     Grievance Number 238306 - Plaintiff's August 2008 Effort to Obtain Medical Assistance

Plaintiff filed grievance number 238306 on August 4, 2008. See Grievance No. 238306 from plaintiff to Moyer (Aug. 4, 2008) (Def.'s Ex. C). He asserted that on July 9, 2008 he went to sick call because he "was experiencing a pain and weakness in [his] legs and feet; there was also no feeling in [his] legs and feet." Id. The doctor who examined plaintiff at sick call indicated that he would be seen by a doctor for his problems. Id. By July 21, 2008, plaintiff still had not been seen by a doctor so he wrote a letter to Stefanic to inform him of his condition. Id. Plaintiff asserted that as of August 4, 2008 when he filed the grievance he had neither seen a

doctor nor heard from Stefanic.  Id.

Stanishefski denied plaintiff's grievance on August 13, 2008.  See Official Inmate
Grievance Initial Review Response from Stanishefski to Plaintiff (May 12, 2008) (Def.'s Ex. C).
He noted that plaintiff had been referred to Dr. Line after his sick call visit on July 9, 2008 and
that he had been seen by Dr. Zaro on August 12, 2008.[5]  Id.  According to Stanishefski, Dr. Zaro
prescribed steroid therapy and Neurontin and scheduled plaintiff for a follow up visit in three
weeks.  Id.

Plaintiff was dissatisfied with this response because he had been prescribed steroids in the
past and they had been ineffective.  See Pl.'s Dep. 137:13-18.  According to plaintiff he also had
not yet received the brace that had been prescribed for him.  Id. at 137:13-14.  There is no record
of an appeal of Stanishefski's response.

X.     Grievance Number 246028 - Plaintiff's October 2008 Effort to Obtain his Medical
       Records

On October 6, 2008, plaintiff filed grievance number 246028.  See Grievance No. 246028
from plaintiff to Moyer (Oct. 6, 2008) (Def.'s Ex. C).  He asserted that after he had filed this
lawsuit against PHS some of his medical records had been deleted.  Id.  More specifically,
plaintiff believed that the records from his visit to Temple hospital had been deleted.  Pl.'s Dep.
140:22 - 141:2.

Stanishefski denied plaintiff's grievance on October 6, 2008.  See Official Inmate
Grievance Initial Review Response from Stanishefski to Plaintiff (May 12, 2008) (Def.'s Ex. C).
He did, however, scheduled a meeting between plaintiff and Joan Scott, PHS's medical records

---

[5]        Neither Dr. Line nor Dr. Zaro are identified in the record.

18

director, to discuss plaintiff's concerns.  Id.  Plaintiff first met with Scott on October 20, 2008.

See Appeal to Grievance No. 246028 from plaintiff to DiGuglielmo (Oct. 28, 2008) (Def.'s Ex.

C).  During that meeting, he identified the documents that he believed to be missing.  Id.  He

testified that he had no reason to believe that any of the defendants had caused the documents to

go missing.  Pl.'s Dep. 143:15 - 144:5.  Scott scheduled another meeting on October 24, 2008.

See Appeal to Grievance No. 246028 from plaintiff to DiGuglielmo.  In the interim, she would

attempt to locate the allegedly missing files.  Id.  Plaintiff asserted that Scott had located some of

the missing files but most remained unaccounted for.  Id.  He accordingly appealed Stanishefski's

denial of grievance number 246028, arguing that many of his medical files had been improperly

deleted.  Id.  DiGuglielmo remanded the grievance to Stanishefski for further investigation into

the allegedly missing files.  See Memorandum from DiGuglielmo to plaintiff (Nov. 7, 2008)

(Def.'s Ex. C).  Scott, on behalf of Stanishefski, then arranged all of plaintiff's medical records

into chronological order and obtained a list of the records that plaintiff wished to review.

See Official Inmate Grievance Initial Review Response from Stanishefski to Plaintiff (Nov. 17,

2008) (Def.'s Ex. C).  Scott was able to locate all but one of the records plaintiff sought–the

record of an alleged consultation with Dr. Kamal in 2000.  Id.  She informed plaintiff that there

was no indication that PHS had ever received the record in question but promised plaintiff that

she would request the record from Temple.  Id.  She denied plaintiff's grievance.  Id.

Plaintiff appealed Scott's denial to DiGuglielmo.  See Appeal to Grievance No. 246028

from plaintiff to DiGuglielmo (Nov. 24, 2008) (Def.'s Ex. C).  He requested that DiGuglielmo

investigate the allegedly missing records.  Id.

On December 10, 2008, Scott emailed DiGuglielmo and Stanishefski to inform them that

she had spoken with a representative from the Temple University Hospital Medical Records Department.  See Email from Scott to DiGuglielmo and Stanishefski (Dec. 10, 2008 8:35 A.M.) (Def.'s Ex. C).  After checking both of the relevant databases, the Medical Records Department representative informed Scott that there was no record of a visit by plaintiff in 2000.  Id.  She did, however, find a report from Dr. Kamal pertaining to plaintiff dated April 28, 2003.  Id.  On the basis of Scott's investigation DiGuglielmo upheld Scott's denial of plaintiff's grievance.

See Memorandum from DiGuglielmo to plaintiff (Dec. 10, 2008) (Def.'s Ex. C).

XI.     Grievance Number 248975 - Plaintiff's November 2008 Effort to Clarify the Level of
        Prescription Medication that he Was Supposed to Receive

On November 3, 2008, plaintiff filed grievance number 248975.  See Grievance No. 248975 from plaintiff to Moyer (Nov. 3, 2008) (Def.'s Ex. C).  He complained that a physician's assistant, while treating plaintiff for high cholesterol, had reduced the quantity of "medication for spine and nerve damage" that plaintiff had been prescribed.  Id.  Plaintiff asserted in his grievance that the physician's assistant's actions constituted "malpractice as well as retaliation for the civil suit [he] filed against PHS."  Id.  Stanishefski denied grievance number 248975, finding that the physician's assistant had not "[altered or discontinued] any medications order[ed] by [the physician] on August 26, 2008. [The physician] ordered the medication for 210 days."  Id.

Plaintiff appealed this decision to the superintendent.  See Appeal to Grievance No. 248975 from plaintiff to DiGuglielmo (Dec. 9, 2008) (Def.'s Ex. C).  He asserted that the physician had prescribed the medication on August 12, 2008 and had followed up on September 23, 2008 to ensure that the medication was working properly.  Id.  Despite the fact that the prescription was valid for 210 days, on September 29, 2008, the physician's assistant altered the

prescription.  Id.  DiGuglielmo remanded the grievance to Stanishefski for further investigation.

See Memorandum from DiGuglielmo to plaintiff (Dec. 22, 2008) (Def.'s Ex. C).  Stanishefski

reported the next day that the physician's assistant had altered plaintiff's medication pursuant to

the physician's order.  See Official Inmate Grievance Initial Review Response from Stanishefski

to Plaintiff (Dec. 23, 2008) (Def.'s Ex. C).  Plaintiff was satisfied that he had received

appropriate care after learning that the adjustment was initiated by the physician.  Pl.'s Dep.

159:16-20.  He did not appeal the denial of his grievance.  Id.

Plaintiff received an MRI on April 1, 2009, which revealed that both his spinal lesion and

spinal stenosis had stabilized.  Dr. Osgood examined the MRI and concluded that additional

surgery was not necessary.

XII.    Grievance Number 282370 - Plaintiff's July 2009 Effort to Obtain the Braces that Had
        Been Prescribed for him

Plaintiff filed grievance number 282370 on July 23, 2009.  See Grievance No. 248975

from plaintiff to Wendy Shaylor (July 23, 2009) (Def.'s Ex. C).  He asserted that on July 10,

2009 he had requested that Stanishefski investigate why he had not yet received the promised

braces and schedule, on plaintiff's behalf, an appointment with Dr. Zaro to explore pain

management options.  Id.  Stanishefski had not responded to his request.

Jean Wooster, RN Supervisor, denied his grievance on July 28, 2009.  See Official

Inmate Grievance Initial Review Response from Wooster to Plaintiff (July 28, 2009) (Def.'s Ex.

C).  She informed him that "[t]he vendor received the braces on July 28, 2009 [and that he]

would be on the call sheet for Friday, July 31, 2009 to receive the braces."  Id.  She also noted

that Dr. Zaro is not assigned to the pain management clinic.  Id.  She suggested that plaintiff

"[s]ign up for sick call to discuss a referral to the pain management clinic."  Id.

Plaintiff appealed Wooster's decision on August 1, 2009.  See Appeal to Grievance No. 282370 from plaintiff to DiGuglielmo (Aug. 1, 2009) (Def.'s Ex. C).  Plaintiff indicated in his appeal that he had not yet received the braces that Wooster had promised would be delivered by July 31, 2009.  Id.  He also asked that he be permitted to consult with Dr. Zaro about the increasing pain and weakness that he had been experiencing in his lower extremities.  Id. DiGuglielmo upheld the denial of grievance number 282370.  See Memorandum from DiGuglielmo to plaintiff (September 16, 2009) (Def.'s Ex. C).  He noted that the medical staff indicated that plaintiff had received his brace on August 4, 2009, that he had consulted with Dr. Zaro on August 12, 2009 and that he had received an injection from Stefanic on August 21, 2009. Id.

## STANDARD OF REVIEW

Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23.  If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A fact is "material" if it might affect

the outcome of the case under governing law.  Id.

To establish "that a fact cannot be or is genuinely disputed," a party must:

> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the movant.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

ANALYSIS

Defendants argue that they are entitled to summary judgment for several reasons.  First, all defendants argue that plaintiff has not exhausted his administrative remedies.  Second, PHS argues that plaintiff has not produced evidence that PHS has a policy, practice or custom that violated plaintiff's Eighth Amendment rights.  Third, defendants Smith and Stefanic argue that plaintiff has not produced evidence that they were deliberately indifferent to plaintiff's medical needs.  Fourth, all three medical defendants argue that plaintiff has not produced evidence that their deliberate indifference caused plaintiff's injuries.  Fifth, the commonwealth defendants

argue that there is no evidence that they were deliberately indifferent to plaintiff's medical needs. Sixth, defendant DiGuglielmo argues that he cannot be held personally liable for plaintiff's Eighth Amendment claims. Finally, all defendants argue that plaintiff's claims are barred by the statute of limitations. I will begin by addressing defendants' suggestion that plaintiff has not exhausted his administrative remedies.

I.      Exhaustion of Administrative Remedies

All defendants argue that plaintiff has failed to exhaust his administrative remedies. The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The Supreme Court has held that prisoners must exhaust all "available" remedies. Woodford v. Ngo, 548 U.S. 81, 84 (2006); accord Williams v. Beard, 482 F.3d 637, 639 (3d Cir. 2007).

The parties agree that Pennsylvania law establishes a mandatory three step administrative review process. See Department of Corrections Policy Statement DC-ADM 804, Inmate Grievance System at part VI (Jan. 3, 2005) (Def.'s Ex. A); see also Drippe v. Tobelinski, 604 F.3d 778, 780 (3d Cir. 2010) (describing the three step process for exhaustion of prisoner grievances). A prisoner's grievance is first reviewed and decided by the prison's Grievance Coordinator. See DC-ADM 804 at p.6. If the prisoner is dissatisfied with the Grievance Coordinator's decision, he or she must appeal to the facility manager–in this case, the superintendent of the prison. Id. at 7. If the prisoner is dissatisfied with the superintendent's decision, he or she must again appeal to the Secretary of the Department of Corrections's Office

of Inmate Grievances and Appeals.  Id. at 9.

The parties agree that plaintiff did not appeal any of his grievances to the Secretary's Office of Inmate Grievances and Appeals.  See Pl.'s Br. at 17 ("Defendants are correct that Mr. Carter did not appeal any of his grievances to the highest level of review prior to filing his amended complaint in this action.").  Plaintiff argues, however, that for two reasons his failure is not fatal to his claims.  First, he argues that he was not obligated to file a third-stage appeal of any of his grievances because he had received "partial or full relief" after first-stage or second-stage review.  Second, his failure should be excused because prison staff prevented him from obtaining the full extent of available administrative review.

A.      Under the Circumstances Presented by this Case, Plaintiff Was not Obligated to Seek Third-Stage Review of his Grievances

The essence of plaintiff's argument is that because plaintiff's grievances and second-stage appeals "were met with promises of either partial or full relief" he was not obligated to seek third-stage review.  In other words, the PLRA does not obligate him to appeal favorable decisions.  In support of this position, plaintiff cites Harvey v. Jordan, 605 F.3d 681, 683 (9th Cir. 2010).[6]  There, a prisoner had been given a "notice of disciplinary charges for his alleged failure to comply with [a] search of his cell [by prison authorities]."  Harvey, 605 F.3d at 684.  Although prison regulations require that a prisoner charged with disciplinary infractions be given a hearing within thirty days of the institution of the charges, more than five months after the charges had been filed Harvey had not received such a hearing.  Id.  He therefore filed a grievance requesting that he be given the hearing to which he was entitled as well as a copy of

_____

[6]      The Court of Appeals for the Third Circuit has not decided whether an inmate must seek third-stage review of a favorable decision.

the videotape of his cell extraction, which he claimed would "prove [his] innocence." Id. at 684-85. He also requested that if he were not given the hearing and the videotape that the disciplinary charges be dropped and his prisoner status be adjusted to reflect the dropped charges. Id. at 685. In response, prison officials promised to provide both the hearing and a copy of the videotape. Id. Five months later, when Harvey still had not received a hearing, he filed an appeal of the original decision. Id. Prison officials denied the appeal as untimely. Id.

Harvey then filed a section 1983 claim in United States District Court for the Northern District of California. The District Court held that Harvey's appeal had been untimely and dismissed the claim for failure to exhaust administrative remedies. Id. at 684. The Court of Appeals for the Ninth Circuit disagreed, holding that "[a]n inmate has no obligation to appeal from a grant of relief, or a partial grant of relief that satisfies him, in order to exhaust administrative remedies." Id. at 685.

In coming to its conclusion, the Harvey Court found Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir. 2004), to be persuasive. In Abney, the plaintiff was a New York state prisoner who alleged that the prison's refusal to provide him with orthopedic footwear constituted a violation of his constitutional rights. See Abney, 380 F.3d at 665. Abney filed four formal grievances between July 1999 and April 2001. Id. at 666. Each grievance resulted in a favorable ruling by the inmate grievance resolution committee and the superintendent. Id. He did not therefore appeal any of the decisions to the Central Office Review Committee which was the third and final level of grievance review available to inmates. Id. The District Court held that Abney's failure to seek third-stage review of his grievance meant that he had not exhausted his administrative remedies. Id. The Court of Appeals reversed. Id. at 669. It reasoned that to

require an inmate to appeal favorable rulings would place the inmate in a "Catch-22"–by appealing a favorable ruling the inmate would risk reversal; by not appealing the inmate would risk being barred for failing to exhaust his administrative remedies. Id. Additionally the Court was persuaded by the proposition that to require inmates to seek third-stage review of favorable rulings would allow prison officials to keep inmates "out of court indefinitely by saying 'yes' to their grievances and 'no' in practice." Id., quoting Sulton v. Wright, 265 F. Supp. 292, 298-99 (S.D.N.Y. 2003). According to the Abney Court, where an inmate receives a favorable ruling, "no further administrative proceedings [are] available" to the inmate. Id.; see also 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") (emphasis added).

I agree with the logic of Harvey and Abney and thus hold that plaintiff need not have sought third-stage review of favorable decisions by the superintendent in order to have exhausted his administrative remedies. To the extent that plaintiff received unfavorable decisions from the superintendent, however, the PLRA required him to appeal those decisions before filing suit in this Court. I must therefore decide which, if any, of the superintendent's decisions were unfavorable to plaintiff.

Review of plaintiff's administrative record reveals that he received unfavorable decisions on grievance numbers 29209 (complaining that disapproval of referrals for CT scans and MRIs constituted denial of medical treatment), 228621 (attempting to correct what he believed to be "misleading information" in his medical file) and 246028 (requesting that DiGuglielmo and other prison staff members investigate plaintiff's allegation that medical records were missing from his

file).[7]  Plaintiff has not exhausted his administrative remedies with respect to the issues contained

in each of these four grievances.  They therefore cannot form the basis of his claims in this Court.

On the other hand, plaintiff received favorable decisions on either first-level or second-

level review with respect to grievance numbers 45405 (requesting a neurology appointment),

75662[8] (requesting that he be permitted to visit a neurologist and an internist), 93634

(complaining that he had been overlooked for a medical appointment to renew his prescriptions),

146347 (complaining that he needed an appointment with an internist and that he had not

received hip and groin braces that had been prescribed for him), 169277 (requesting that spinal

surgery be scheduled), 174269 (complaining that he had been sent to UPMC for a pre-surgery

appointment but that PHS had failed to send the necessary MRI films), 282370 (requesting the

hip and groin braces that had been prescribed for him), 238306 (requesting that he be seen by a

doctor because he had been "experiencing pain and weakness in [his] legs and feet") and 248975

---

[7]     Plaintiff also submitted letters to staff members on several occasions.  The
Pennsylvania Department of Corrections requires that in order to initiate the grievance process an
inmate must submit a grievance to the "Facility Grievance Coordinator using the DC-804, Part 1
[form]."  See DC-ADM 804 at p.4.  Because plaintiff's letters did not conform to the
requirements of the DOC's grievance process, such letters could not constitute administrative
exhaustion.  See Hookey v. Lomas, 1:CV-08-02284, 2010 WL 936230, at *5 n.5 (M.D. Pa. Mar.
15, 2010) ("To the extent that [the plaintiff] claims she wrote letters to Attorney General Corbett
and Agent Howley, such is not proper exhaustion under SCI-Muncy's prison grievance
procedure."); Carrington v. Brennier, No. 4:CV-06-2428, 2007 WL 846616, at *2 (E.D. Pa. Mar.
19, 2007) ("To the extent that plaintiff claims that he wrote a letter to the Warden, such is not
proper exhaustion under the Schuylkill County Prison Grievance Procedure.").

[8]     Plaintiff points out that DiGuglielmo "modified" the initial decision on grievances
75662 and 146347.  DC-ADM 804 does not anticipate "modify" as a response to a grievance.
See DC-ADM 804 at p.8 (setting forth the allowable dispositions of an appeal of an initial
grievance).  Nevertheless, I conclude that whether the result was favorable or unfavorable to
plaintiff does not depend on the technical disposition of the appeal but rather on whether and to
what extent plaintiff received what he asked for in the grievance.  I find that plaintiff received a
favorable decision with respect to grievance numbers 75662 and 146347.

(requesting clarification as to why his prescription had been altered).

      B.     Defendants Did not Prevent Plaintiff from Appealing those Grievances that Resulted in Unfavorable Decisions

Plaintiff alternatively argues that defendants prevented him from appealing the unfavorable decisions by "promising [plaintiff] the relief he requested in his grievances and appeals to the Superintendent." Pl.'s Br. at 23. I disagree. Grievance number 29209 argued that disapproval of the referrals for CT scans and an MRI of plaintiff's neck and head constituted a denial of medical treatment. After second-level review, superintendent Vaughn upheld the grievance officer's denial of the grievance and wrote "[t]he Medical Department is in the best position to address your concerns and take appropriate action." See Memorandum from Vaughn to Plaintiff (Def.'s Ex. C.). This response in no way indicated that the relief plaintiff sought would be forthcoming. I therefore find that plaintiff could not reasonably have been mislead into believing that third-level review was unnecessary.

Grievance number 228621 sought treatment of plaintiff's spinal tumor. Specifically, he asked why his scheduled trip to SCI-Smithfield for spinal tests had been cancelled and why nothing had been done to remove the tumor. See Appeal to Grievance No. 228621 from plaintiff to DiGuglielmo (June 2, 2008) (Def.'s Ex. C). DiGuglielmo denied the appeal of grievance number 228621 on the grounds that plaintiff was "disputing information provided by a trained medical professional [and that DiGuglielmo] was not qualified to overrule their decisions." See Memorandum from DiGuglielmo to plaintiff (June 3, 2008) (Def.'s Ex. C). Plaintiff's argument that DiGuglielmo's response indicated some likelihood of a favorable outcome is untenable.

Grievance number 246028 sought an investigation into medical records that he alleged were missing.  See Appeal to Grievance No. 246028 from plaintiff to DiGuglielmo (Nov. 24, 2008) (Def.'s Ex. C).  Scott denied the grievance on the grounds that no such record existed and DiGuglielmo upheld the denial.  See Memorandum from DiGuglielmo to plaintiff (Dec. 10, 2008) (Def.'s Ex. C).  There was no basis for plaintiff to believe that the relief he sought was forthcoming.

Because there is no evidence that defendants prevented plaintiff from pursuing appeals of these three grievances, I find that plaintiff is barred from pursuing in this Court claims based on such grievances.

C.      Plaintiff Adequately Grieved his Complaints Against PHS and Stefanic

Defendants PHS, Smith and Stefanic argue that plaintiff's grievances do not identify them specifically enough to satisfy the requirements of DC-ADM 804, which provides:

> The inmate will include a statement of the facts relevant to the claim. The text of the grievance **must** be legible, ***understandable, and*** presented in a courteous manner, and the statement of facts shall not exceed two pages . . . .  The inmate will identify any person(s) who may have information that could be helpful in resolving the grievance.  In Section B of the **DC-804, Part 1**, the inmate should also include information on attempts to resolve the matter informally. The inmate will also specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or any other law.  ***If the inmate desires compensation or other legal relief normally available from a court, the inmate shall request the specific relief sought in his/her initial grievance***.

See DC-ADM 804 at pp. 4-5 (bold and italics in original).  This provision makes it mandatory for an inmate to name the individual whom he alleges was responsible for the issue set forth in the grievance.  See Spruill v. Gillis, 372 F.3d 218, 233-35 (3d Cir. 2004) (finding, under a prior

version of the provision, that it was mandatory for the inmate to identify in his grievances the individuals who caused his injury).  The Spruill Court recognized that the purpose of the identification provision is "to put the prison officials on notice of the persons claimed to be guilty of wrongdoing."  Id.

The only grievance that names Smith is number 29209, which I have held was not properly exhausted.  Accordingly, I must dismiss plaintiff's claims against Smith.[9]

Stefanic is named in grievance number 238306, which I have held was properly exhausted.  Plaintiff alleged that Stefanic had failed to respond to his written request for medical treatment.  See Grievance Number 238306 from plaintiff to Moyer (Aug. 4, 2008) (Def.'s Ex. C); see also Official Inmate Grievance Initial Review Response from Stanishefski to Plaintiff (May 12, 2008) (Def.'s Ex. C).  Plaintiff's identification of Stefanic is sufficient to satisfy plaintiff's obligations under DC-ADM 804.[10]

Plaintiff has likewise adequately identified PHS during the grievance process.  Although plaintiff never specifically identified PHS as responsible for his injuries, he made claims against "the S.C.I.G. hospital staff," alleging that he had not received a neurological consultation that had been prescribed for him.  See Grievance Number 45405 from plaintiff to Hatcher (Feb. 28,

---

[9]	Smith departed from PHS shortly after grievance number 29209 was filed.  Smith Dep. 108:7-22.

[10]	Stefanic argues in his reply brief that the grievance against him, which plaintiff filed on August 4, 2008, cannot constitute exhaustion because it was filed more than seven months after plaintiff filed his original complaint.  I disagree. Plaintiff filed an amended complaint on March 16, 2009, well after plaintiff exhausted his administrative remedies against Stefanic.  See Pergine v. Penmark Mgmt. Co., Inc., 314 F. Supp. 2d 486, 490 (E.D. Pa. 2004) (finding that "to the extent that plaintiff's PHRA claims were unexhausted at the time of the filing of the original complaint, they were clearly exhausted at the time the amended complaint was filed; therefore, plaintiff's PHRA claims are not untimely.").

2003) (Def.'s Ex. 6).  He also made various claims against "the medical department," alleging

that he was in severe pain and "nothing [was] being done about it."  See, e.g., Grievance Number

146347 from plaintiff to Moyer (Mar. 9, 2006) (Def.'s Ex. C); Grievance Number 75662 from

plaintiff to Hatcher (Feb. 10, 2004) (Def.'s Ex. C); Grievance Number 174269 from plaintiff to

Moyer (Dec. 21, 2006) (Def.'s Ex. C) (claiming that plaintiff was not able to schedule a

necessary surgical procedure because "Graterford Medical Department" did not send the

necessary MRI films).  In grievance number 93634, plaintiff claimed that he was enduring an

"ongoing problem with being overlooked for [his] internal medical appointments."  See

Grievance Number 93634 from plaintiff to Moyer (Aug. 23, 2004) (Def.'s Ex. C).  These

identifications are sufficient, as required by Spruill, to put prison officials on notice of claims

against PHS.

In addition, the Court of Appeals has held that where an inmate does not properly identify

an individual in his grievance but the grievance officer identifies that individual in his response

to the grievance the prison has waived the inmate's technical failure.  See Spruill, 372 F.3d at

234 ("As such, the prison can excuse an inmate's failure to do so by identifying the unidentified

persons and acknowledging that they were fairly within the compass of the prisoner's

grievance.").  In this case, the responses to several of plaintiff's grievances identified PHS by

name.  See, e.g., Memorandum from DiGuglielmo to plaintiff regarding the Appeal of Grievance

Number 146347 (Apr. 18, 2006) (Def.'s Ex. C) ("I will follow up with PHS staff to see where

your consult for the brace is."); Official Inmate Grievance Initial Review Response from Knauer

to plaintiff (Nov. 10, 2006) (Def.'s Ex. C) ("Per PHS scheduling program and PHS clinic

Coordinator Jackie Wood, the surgery has not been approved or given an authorization number

from PHS Corporate so it can be scheduled."). Mindful of the <u>Spruill</u> Court's admonition that the "prison grievance review culture [should not be] marked by technicalities," <u>see</u> <u>Spruill</u>, 372 F.3d at 235, I conclude that plaintiff has adequately identified PHS in grievance numbers 45405, 146347, 75662, 174269, 93634 and 169277.[11]

II.     Plaintiff Has not Produced Sufficient Evidence to Support his Claims

Each of the defendants argues that plaintiff has not produced evidence in support of his claims against them. I will discuss first the legal principles applicable to all defendants. I will then discuss the evidence against each defendant in turn.

Section 1983 provides a mechanism for the vindication of federal statutory and constitutional rights. <u>See</u> <u>Benn v. Univ. Health Sys., Inc.</u>, 371 F.3d 165, 174 (3d Cir. 2004). "To establish a claim under [section 1983], a plaintiff must demonstrate a violation of a right protected by the Constitution or the laws of the United States committed by a person acting under the color of state law." <u>See</u> <u>Natale v. Camden Cnty. Corr. Facility</u>, 318 F.3d 575, 580-81 (3d Cir. 2003), <u>citing</u> <u>Nicini v. Morra</u>, 212 F.3d 798, 806 (3d Cir. 2000). There is no dispute that all defendants are state actors.

I turn, then, to the question of whether there is evidence that defendants violated plaintiff's constitutional rights. The Supreme Court has indicated that the first step in this inquiry is to "'identify the exact contours of the underlying right said to have been violated' in order to determine 'whether [plaintiff] has alleged a deprivation of a constitutional right at all.'" <u>See</u> <u>id.</u> at 581, <u>quoting</u> <u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. 833, 841 n.5 (1998). Plaintiff has

---

[11]     On the other hand, I find that grievance numbers 282370, 248975 and 238306 do not identify PHS as the party responsible for the harm alleged in those grievances.

alleged that defendants violated his Eighth Amendment right to adequate medical care. "In order to establish a violation of [plaintiff's] constitutional right to adequate medical care, evidence must show (i) a serious medical need, and (ii) acts or omissions by [defendants] that indicate deliberate indifference to that need." Id., citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

A.     PHS

A private corporation such as PHS may be held liable under section 1983. See Roach v. SCI Graterford Med. Dep't., 398 F. Supp. 2d 379, 388 (E.D. Pa. 2005). PHS's liability is limited, however, in that it cannot be held liable for the actions of its staff under a respondeat superior theory. See id. Instead, it may be held liable only if "it knew of and acquiesced in the deprivation of the plaintiff's rights." Id. "To meet this burden with respect to [PHS], the plaintiff must show that the corporation, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [plaintiff's] constitutional harm.'" Id., quoting Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989).

"[A] [p]olicy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990), quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986). "A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." Id., quoting Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 691 (1978). The Court of Appeals has held that

> [t]here are three situations where acts of a government employee may
> be deemed to be the result of a policy or custom of the governmental
> entity for whom the employee works, thereby rendering the entity
> liable under § 1983. The first is where the appropriate officer or entity
> promulgates a generally applicable statement of policy and the
> subsequent act complained of is simply an implementation of that
> policy. The second occurs where no rule has been announced as
> policy but federal law has been violated by an act of the policymaker
> itself.   Finally, a policy or custom may also exist where the
> policymaker has failed to act affirmatively at all, though the need to
> take some action to control the agents of the government is so
> obvious, and the inadequacy of existing practice so likely to result in
> the violation of constitutional rights, that the policymaker can
> reasonably be said to have been deliberately indifferent to the need.

Natale, 318 F.3d at 584 (internal quotation marks and citations omitted).  The plaintiff bears the

burden of proving that a "policymaker" is responsible for either the policy or the custom that

caused the alleged constitutional violation.  See id.  According to the Supreme Court, "the

question of who is a policymaker is a question of state law."  Id., citing City of St. Louis v.

Praprotnik, 485 U.S. 112, 142 (1988).

>    1.    There Is No Evidence that PHS Provided Inadequate Care to Plaintiff for
>          Impermissible Financial Reasons

Plaintiff identifies two PHS policies that allegedly caused his injury.  First, he argues that

PHS maintained a policy of "improperly weighing the cost of medical care when deciding on a

course of treatment.  It favored cheaper, easier, on-site treatment regardless of the needs of its

patients."  See Pl.'s Br. at 29-30.  Plaintiff has not, however, cited to any evidence in the record

establishing that such a policy existed.  My review of the record reveals that the only indication

of such a policy comes from plaintiff's own speculation.  For example, plaintiff alleged in his

complaint that PHS maintained a "cost-saving incentive program" whereby physicians would

receive a bonus if they were able to reduce the cost of treating an inmate.  See Compl. ¶ 57.

When asked at his deposition about what evidence he had of such an incentive program, plaintiff testified "I guess, if you would look at the contract, it probably would show you that they have a bonus system." <u>See</u> Pl.'s Dep. 77:3-7. To the contrary, Jack Staffaroni, PHS's regional vice president for Eastern Pennsylvania, testified that PHS employees receive a salary based on their position. Staffaroni Dep. 60:17 - 61:6 (June 23, 2010) (Def.'s Ex. S). Staffaroni categorically denied that there is any incentive or bonus program for PHS employees. <u>Id.</u> at 61:8-10. He also explained that if PHS's costs were unexpectedly to exceed a particular benchmark set forth in the contract the Department of Corrections would pay the excess. <u>Id.</u> at 62:3-6. I find that there is no evidence to support plaintiff's contention that PHS maintains an incentive program. Plaintiff's speculation is insufficient to raise a genuine issue of material fact on this issue.

Plaintiff also alleged that PHS chose to provide him with an x-ray as opposed to an MRI or a CT scan in order to save money. Pl.'s Dep. 38:16-22. He admits, however, that he does not have any evidence that the decision was made for financial reasons. <u>Id.</u> at 40:21-24 ("Q. Am I correct that you don't have any evidence, that it's just your personal belief? A. Well, yes, yes. Let me put it that way."). On the other hand, Smith testified that he disapproved the MRI and CT scan referrals because he preferred to take a gradual approach. Smith's Dep. 51:15-18 ("I would take the first steps first . . . ."). He testified that plaintiff's symptoms could have been caused by a variety of problems and that an x-ray would ordinarily precede an MRI or CT scan in the diagnostic process.[12] <u>Id.</u> at 52:2-24. For similar reasons, Smith disapproved a PHS physician's recommendation that plaintiff consult with a neurologist. <u>Id.</u> 58:10-11. He testified that before examining plaintiff the neurologist would want certain baseline studies such as x-rays and CT

_____

[12]     Plaintiff ultimately received the MRI that he had requested. Pl.'s Dep. 105:1-4.

scans. Id. at 58:4-22. Because such baseline studies had not been conducted at the time of the referral, Smith thought it would be fruitless to send plaintiff to the neurologist; he anticipated that plaintiff would simply be returned with a request to have the baseline studies done first. Id. at 58:19-59:1 ("Q. What was the basis for your decision to disapprove this consult recommendation? A. As I stated previously, if he was sent out to neurology, they would want to see some baseline studies. Otherwise, they're going to send him back and request the baseline studies be done and have him come back again for reevaluation."). I find that there is no evidence that Smith's decision to disapprove the CT scan, MRI and neurological consultation was based on impermissible factors.[13]

There is no evidence in the record that PHS provided inadequate medical care to plaintiff in order to save money. No reasonable jury could find in favor of plaintiff on this theory.

      2.      There Is No Evidence that PHS's Policies Regarding the Scheduling and Monitoring of Inmate Care Reflected Deliberate Indifference to Plaintiff's Serious Medical Needs

Plaintiff argues that "PHS's policies regarding the scheduling and monitoring of inmate care at Graterford also reflect a conscious disregard for the serious medical risks posed to [plaintiff]." Pl.'s Br. at 30. The evidence indicates that there were several instances where plaintiff's treatment was delayed. Plaintiff cites the facts that he missed the MRI that was scheduled for June 2005 and that his September 2006 spinal surgery had been delayed. Id. In addition, I note that plaintiff has testified that on two occasions he filed grievances to have his

---

[13]      I note additionally that Smith may not have been the PHS policymaker. It appears from the record that his decisions were reviewable by Stannish, PHS's regional director. See Smith Dep. 43:1-5. I need not decide that issue, however, because there is no evidence that the policy of which plaintiff complains actually existed.

prescription medication renewed and that he had difficulty obtaining the orthopedic braces that had been prescribed for him.

Plaintiff does not assert that these instances of delayed treatment were the result of a formal policy. Indeed, there is no evidence suggesting that a PHS policymaker overtly ordered PHS employees to delay the scheduling plaintiff's treatment. His claim is therefore dependent on whether the record contains evidence of an unconstitutional custom, which must be "'so permanent and well settled' as to virtually constitute law." Andrews, 895 F.2d at 1480, quoting Monell, 436 U.S. at 691. I find that there is no such evidence. The examples of delayed treatment described above are not evidence of an unconstitutional custom; instead, they are at most isolated failures of the system designed to provide necessary and effective treatment to inmates. "Isolated violations are not the persistent, often repeated, constant violations that constitute a custom or policy." Banks v. Gallagher, 686 F. Supp. 2d 499, 511 (M.D. Pa. 2009). Additionally and critically, plaintiff has produced no evidence that PHS policymakers were aware of the alleged custom.[14] See Keohane v. Lancaster Cnty., No. 07-3175, 2010 WL 3221861, at *14 (E.D. Pa. Aug. 13, 2010) ("However, even if these practices constituted 'custom,' Plaintiffs must also establish that the practice was so widespread that the policy making officials had either actual or constructive notice, and acquiesced in the custom."). If any of these incidents amounted to a violation of plaintiff's constitutional rights, an issue upon which I presently offer no opinion, I find that such liability is not fairly attributable to PHS.

---

[14] Indeed, plaintiff has not identified those individuals at PHS whom it believe to be policymakers.

3. PHS Is Entitled to Judgment as a Matter of Law

In light of the fact that there is no evidence to establish that PHS knew of and acquiesced

in the violation of plaintiff's constitutional rights, I will grant its motion for summary judgment.

B. Stefanic

Stefanic argues that there is no evidence in the record to support a finding that he

exhibited deliberate indifference to plaintiff's serious medical needs.[15] The Supreme Court has

adopted a subjective test for deliberate indifference. See Farmer v. Brennan, 511 U.S. 825, 837

(1994). The Farmer Court held that "a prison official cannot be found liable under the Eighth

Amendment for denying an inmate humane conditions of confinement unless the official knows

of and disregards an excessive risk to inmate health or safety; the official must both be aware of

facts from which the inference could be drawn that a substantial risk of serious harm exists, and

he must also draw the inference." Id. "Allegations of medical malpractice are not sufficient to

establish a constitutional violation." Spruill, 372 F.3d 218, 235 (3d Cir. 2004).

Plaintiff has advanced only one properly exhausted claim against Stefanic. In grievance

number 238306, he claimed he visited the sick call doctor on July 9, 2008 after he began feeling

pain and weakness in his back, hip and leg. On July 21, 2008, having not yet received any

treatment for his condition, plaintiff wrote to Stefanic and requested his help but received no

reply. In response to grievance number 238306, Stanishefski indicated that plaintiff had been

"referred to [D]octor [L]ine on July 9, 2008 and [that he had been] seen on August 12, 2008 by

Dr. Zaro." See Official Inmate Grievance Initial Review Response from Stanishefski to Plaintiff

---

[15] Smith advances the same arguments as Stefanic. I have already dismissed plaintiff's claim against Smith because plaintiff has not properly exhausted his administrative remedies with respect to that claim.

(Aug. 13, 2008) (Def.'s Ex. C). Stefanic testified that he has no specific recollection of grievance number 238306. Stefanic Dep. 117:2-7 (June 21, 2010) (Def.'s Ex. U).

There is no evidence that Stefanic's failure to reply to plaintiff's letter was motivated by deliberate indifference to plaintiff's serious medical needs. See Rouse, 182 F.3d at 197 ("It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'"). It would be entirely speculative for a jury to so conclude. I will thus grant Stefanic's motion for summary judgment.

## C. Commonwealth Defendants

The commonwealth defendants (DiGuglielmo, Knauer and Stanishefski) argue that the evidence produced by plaintiff does not establish that they were deliberately indifferent to plaintiff's serious medical needs. I agree.

The Court of Appeals has held that "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." See Spruill, 372 F.3d at 236. Plaintiff's grievances were not sufficient to raise a concern that plaintiff was receiving mistreatment or no treatment at the hands of prison medical officials.[16] Indeed, the evidence produced by plaintiff indicates that he was receiving regular

---

[16] The commonwealth defendants argue that knowledge of a constitutional violation may never be imputed to a prison administrator through an inmate grievance. I have previously rejected this argument. See Carter v. Smith, No. 08-279, 2009 WL 3088428, at *5 (E.D. Pa. Sept. 22, 2009). I need not reconsider the question at this stage, however, because even assuming that an inmate's grievance could impute notice of a constitutional violation to prison administrators, the evidence that plaintiff has presented does not establish that any of the commonwealth defendants were deliberately indifferent to his serious medical needs.

treatment for his ailments.  The commonwealth defendants were entitled to rely on the medical

professionals to provide efficacious treatment.  See id. ("If a prisoner is under the care of medical

experts . . . a non-medical prison official will generally be justified in believing that the prisoner

is in capable hands.").  There were, of course, occasions in which plaintiff disagreed with the

course of treatment he was receiving.  However, "[a] disagreement as to the appropriate choice of

medical treatment does not give rise to a constitutional violation because the 'right to be free

from cruel and unusual punishment does not include the right to the treatment of one's choice.'"

Young v. Coleman, No. 10-786, 2011 WL 2112529, at *4 (W.D. Pa. May 2, 2011), citing Layne

v. Vinzant, 657 F.2d 468, 473 (1st Cir. 1981); accord White v. Napoleon, 897 F.2d 103, 110 (3d

Cir. 1990) ("mere disagreements over medical judgment do not state Eighth Amendment

claims.").

Plaintiff's claims against the commonwealth defendants fail for an additional reason: they

responded to every possibly-meritorious grievance by directing further investigation or remedial

measures.[17]  Even assuming that the commonwealth defendants had actual or constructive

knowledge that plaintiff was being mistreated or not treated by the medical defendants, no

reasonable jury could conclude based on the evidence in the record that the commonwealth

defendants responded with deliberate indifference to such mistreatment or non-treatment.  The

commonwealth defendants are therefore entitled to judgment as a matter of law.

CONCLUSION

---

[17]    I held above that plaintiff had administratively exhausted those claims with
respect to which he had received a favorable or partially favorable ruling.  As is apparent from
my discussion in this section, that holding is a double-edged sword with respect to plaintiff's
claims against prison administrators.  It will be rare for a favorable ruling–i.e, one in which a
plaintiff is granted the relief he requests–to constitute deliberate indifference.

I am sympathetic to plaintiff's plight. It appears that he has worked diligently to obtain treatment for his serious medical ailments. It also appears that, while receiving adequate treatment on the whole, he occasionally encountered obstacles such as the fact that it took, by his estimation, almost six years for him to obtain the braces that he had been prescribed. Plaintiff has not, however, produced evidence that any of the obstacles he encountered were the result of deliberate indifference to his serious medical needs.[18] I must therefore enter judgment in favor of defendants of each of plaintiff's claims.

An appropriate Order follows.

---

[18] In light of my conclusions above, I need not decide whether plaintiff has produced sufficient evidence that defendants' actions were the proximate cause of his injury.